1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT
                            DISTRICT OF GUAM
7

8   SURENDRANI HILL,
                                            Civil Case No.  07-00034
9              Plaintiff,

10      vs.                              ORDER RE: DEFENDANT'S MOTION
                                          TO DISMISS SECOND AMENDED
11  BOOZ ALLEN HAMILTON, INC., *et al*.,        COMPLAINT

12             Defendants.

13

14         This case is before the court on Defendant's "Motion to Dismiss the Second Amended

15  Complaint," brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Docket

16  No. 69.  Having considered the filings and relevant authorities, the court hereby **DENIES**

17  Defendant's motion in its entirety, for the reasons given below.[1]

18  **I.      FACTUAL BACKGROUND**

19         In or around April of 2003, Defendant Booz Allen Hamilton ("Defendant" or "BAH")

20  hired Plaintiff Surendrani "Sue" Hill ("Plaintiff") to provide "support services" at Norton and

21  March Air Force Bases in California.  Docket No. 68 ("Second Amended Complaint" or "SAC")

22  at ¶6.  Plaintiff served in this capacity at these locations for about two years, until her transfer to

23  Andersen Air Force Base on Guam in 2005.  *Id*.

24         Toward the end of June of 2005, Defendant designated Plaintiff as a Global Engineering

25  Integration and Technical Assistance contractor ("GEITA").  Docket No. 68 at ¶7.  Plaintiff's

26

27  ─────────────────
        [1]  The court found this motion suitable for decision without oral argument.  *See* Local Civ. R. 7.1 (reposing in
28  court discretion to decide motions "on the basis of the written materials on file," even if parties have requested oral
    argument).

then-supervisor told her that holding this position entailed the following duties: ensuring that

BAH's study/remediation sub-contractor, EA Engineering ("EA"), kept to Standard Operating

Procedures ("SOPs"); providing the United States Air Force ("USAF"), BAH's client, with

"quality" deliverables; and maintaining the USAF's mission and goals in environmental clean-up

projects proceeding under the Installation Restoration Program ("IRP"). *Id.*

Plaintiff's overall narrative is that, while carrying out her duties, she saw evidence of

failures and possible acts of fraud by EA and by Defendant; that she brought this evidence to the

attention of her supervisors; that her supervisors were unwilling to confront and act on this

evidence; and that, after bringing this evidence to the attention of a USAF employee, she was

ultimately fired for her quality-control actions. Docket No. 68 at ¶¶8-14.

Thus, she alleges that in July of 2005 she determined that EA's "document deliverable"

was of substandard quality, and that "[a]lthough at first [James Rosacker, her supervisor]

appeared to listen and agree with Plaintiff that the documents were not up to standard, he soon

started acting as a shield for EA by running interference whenever Plaintiff provided any

negative feedback on EA's work." Docket No. 68 at ¶9.

She also alleges that around October or November of 2005—after both she and the USAF

gave negative feedback to EA—she took part in a conference call with BAH management and

her supervisor, during which she was "sternly warned that she was making it difficult for EA to

succeed and that if it came down to choosing between Plaintiff or EA, the USAF would choose

EA and Plaintiff would lose her position and jeopardize [BAH]." Docket No 68 at ¶10.

Further, she alleges that around the end of 2005, she determined that EA was "double

billing" and brought this to her supervisor's attention, only to be told in April of 2006 that

"although she was deemed technically capable by their client [the USAF], her attitude towards

[EA] was 'unacceptable' according to [Defendant's] core values," and "that she was being placed

on a tentative one-month probation and that she would be terminated if she did not improve her

relationship with EA." Docket No. 68 at ¶¶11-13. She also alleges that, between January 2006

and April 2006, she found evidence that BAH itself had been over-billing, in the form of

1  "invoices indicat[ing] that the actual hours of fieldwork did not match the amount charged for the

2  fieldwork." *Id.* at ¶12.

3      Finally, she alleges that after presenting spreadsheets "itemiz[ing] these billing

4  discrepancies" to her supervisors on May 11, 2006, she was informed the following day that she

5  was to be terminated because "she had made only small improvements" after being put on

6  probation, notwithstanding the fact her supervisor had earlier assured her "on two separate

7  occasions . . . that he was getting positive feedback on her progress." Docket No. 68 at ¶¶12-14.

8  **II.    PROCEDURAL BACKGROUND**

9      As the court has said before, the procedural history in this case is a bit involved.[2]  On

10  June 21, 2007, Plaintiff initiated this action in the United States District Court for the Central

11  District of California, by filing a complaint alleging wrongful retaliatory termination, in violation

12  of Section 1102.5 of the California Labor Code, and wrongful termination in violation of public

13  policy, based on the policies underlying Section 1102.5 of the California Labor Code as well as

14  the California Fair Employment and Housing Act. Docket No. 1. On July 17, 2007, Defendant

15  moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and

16  also moved to strike portions of the complaint. Docket Nos. 7-10. On August 23, 2007, the

17  Central District granted Defendant's motion as to the first claim (on account of failure to exhaust

18  administrative remedies) and denied it as to the second claim, and denied the motion to strike as

19  moot. Docket No. 16.

20      On September 7, 2007, Plaintiff filed her FAC. Docket No. 26. On October 22, 2007,

21  Defendant moved to transfer this case to this court, pursuant to Section 1404(a) of Title 28,

22  United States Code. Docket No. 28. The Central District granted this motion, over Plaintiff's

23  opposition, on November 20, 2007. *See* Docket Nos. 35, 36.

24      On June 23, 2008, Defendant moved to dismiss the FAC. Docket Nos. 47, 48. On

25  September 5, 2008, Plaintiff opposed Defendant's motion to dismiss. Docket No. 57. Defendant

26

27      [2] *See* Docket No. 66 at 3:5.

28

replied to Plaintiff's opposition on September 12, 2008. Docket No. 58.

Then, on October 22, 2008—before the court had ruled on Defendant's motion to dismiss the FAC—Plaintiff moved for leave to file her SAC, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Docket No. 60. On November 19, 2008, Defendant opposed this motion. Docket No. 64. Plaintiff replied to Defendant's opposition on November 26, 2008. Docket No. 65. On January 16, 2009, this court granted Plaintiff's motion to amend and denied as moot Defendant's motion to dismiss the FAC. Docket No. 66.

Finally, on January 23, 2009, Plaintiff filed her SAC. Docket No. 68. The SAC makes two claims: Workplace Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h) ("Claim 1"), and Wrongful Termination in Violation of Public Policy ("Claim 2"). *Id*. at ¶¶15-29. On February 17, 2009, Defendant moved to dismiss the SAC, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Docket Nos. 69, 70. Plaintiff opposed this motion on March 3, 2009. Docket No. 71. Defendant replied on March 10, 2009. Docket No. 72.

## III.   JURISDICTION AND VENUE

The court has jurisdiction over both of Plaintiff's claims. Claim 1 is within the court's federal question jurisdiction. *See* 28 U.S.C. § 1331. Claim 2 is within the court's diversity jurisdiction, as well as its supplemental jurisdiction. *See id*. §§ 1332, 1367.

Venue is proper in this judicial district, the District of Guam, because Defendant conducts business here and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. *See* 28 U.S.C. § 1391; *see also* Docket Nos. 28-31.

## IV.   APPLICABLE STANDARDS

A motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the complaint. Such a motion "is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Develop. Corp*., 108 F.3d 246, 249 (9th Cir. 1997) (internal quotes omitted).

Under 12(b)(6) analysis, the complaint must be construed on the assumption that all of its allegations are true, even if doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 US 544, 556

(2007) (well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). Similarly, the court must accept all reasonable inferences to be drawn from the facts. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). However, the court need not accept as true conclusory allegations, legal characterizations, unreasonable inferences or unwarranted deductions of fact. *See Beliveau v. Caras*, 873 F. Supp. 1391, 1395-96 (C.D. Cal. 1995); *Transphase Systems, Inc. v. Southern Calif. Edison Co.*, 839 F. Supp. 711, 718 (C.D. Cal. 1993).

An FCA retaliation claim "does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b)." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) (*quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 238 n. 23 (1st Cir. 2004)). "Where, as here, the heightened pleading standard of Rule 9(b) does not apply, the complaint 'need only satisfy the Rule 8(a) notice pleading standard . . . to survive a Rule 12(b)(6) dismissal." *Id*. at 1103-04 (*quoting Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1062 (9th Cir. 2004)). Rule 8(a) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Twombly*, 550 U.S. at 555 (*quoting* Fed. R. Civ. P. 8(a)(2)). The complaint need not contain detailed factual allegations, but it must provide more than "a formulaic recitation of the elements of a cause of action." *Id*.

In short, it must allege "enough facts to state a claim that is plausible on its face." *Id*. at 570. If "plaintiffs [do] not nudg[e] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id*. Conversely, a complaint that *does* state "plausible" claims should *not* be dismissed. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory *or* sufficient facts to support a cognizable legal theory." *Mendiondo*, 521 F.3d at 1104 (emphasis added).

# V.    ANALYSIS

## A.    Claim 1, Workplace Retaliation in Violation of the False Claims Act,  Is Plausible and Therefore Adequately Alleged

Defendant maintains that Claim 1 should be dismissed because it fails to state a claim upon which relief may be granted.  *See*, *e.g.*, Docket No. 70 at 4:6-10:25.  The court disagrees. Defendant's account of the law is incorrect; on a correct account of the law, Claim 1 clearly states a claim upon which relief may be granted.  Moreover, Claim 1 is adequately alleged even on Defendant's incorrect account of the law.  As such, Defendant's argument fails as to Claim 1.

### 1.    Defendant's account of the law is incorrect

"A plaintiff alleging a[n] FCA retaliation claim must show three elements: (1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." *Mendiondo*, 521 F.3d at 1103.  Engaging in "protected activity" means (i) having a reasonable belief that someone was possibly committing fraud against the government, and (ii) investigating that possible fraud. *Id*. at 1104.

Defendant argues that Plaintiff cannot have engaged in "protected activity" unless she reasonably believed that her *employer*, and not any other party, was the entity committing fraud against the government.  *See*, *e.g.*, Docket No. 70 at 10:21-22.  This is wrong, as will be shown by an analysis of the statutory language, the relevant case law, and the policy underlying the FCA.

### i.    Statutory language

First, the statutory language does not support Defendant's account.  The FCA retaliation provision provides that "[a]ny employee who is discharged . . . by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, *including investigation for . . . an action filed or to be filed under this section*, shall be entitled to all relief necessary to make the employee whole."  31 U.S.C. § 3730(h) (emphasis added).  The plain language, then, gives a cause of action to a person who was fired

Page 6 of  27

Case 1:07-cv-00034   Document 76   Filed 06/09/09   Page 6 of 27

for engaging in lawful actions "in furtherance" of an FCA investigation. The statute says nothing about who the target of the FCA investigation must be. *See also United States ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1107 (C.D. Cal. 2001) ("The language of [Section 3730(h)] precludes *any employer* from retaliating against an employee for engaging in lawful actions that further an FCA claim or investigation, irrespective of whether it is the employer that is the target of the FCA investigation.") (emphasis in original). *Cf. United States ex rel. Kent v. Aiello*, 836 F. Supp. 720, 724 (E.D. Cal. 1993) ("It appears relatively clear that properly read, the statute defines the class of plaintiffs who may bring suit under 31 U.S.C. § 3730(h) rather than those against whom suit may be brought. That is to say that while it is true that under the statute a plaintiff must have been an employee, the statute says nothing about the class of defendants.").[3]

### ii.    Relevant case-law

The second reason Defendant's account of the law is wrong that the relevant case-law directly contradicts it. Courts that actually considered the issue have held that "protected activity" under Section 3730(h) may be found where a plaintiff reasonably believed that her employer, or a related third party, was possibly committing fraud against the government. For example, the *Satalich* court rejected the view that Section 3730(h) is "so limited as to protect only those whistleblowers who investigate matters which could lead to a viable FCA action against their employers." *Satalich*, 160 F. Supp. 2d at 1108. The court pointed out that "[t]he statute does *not* read: 'Any employee who is discharged by his or her employer because of lawful acts done by the employee . . . in furtherance of an action against the employer under this

---

[3] In fact, the statutory language makes it fairly clear that the target of the FCA investigation may be an unrelated party. Section 3730 provides for "a civil action for a violation of section 3729." *Id*. § 3730(b)(1). Section 3729 imposes liability on, *inter alia*, any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." *Id*. § 3729(a)(1). And "claim" is defined to include "any request or demand, whether under a contract or otherwise, for money or property *which is made to a contractor* . . . if the United States Government provides *any* portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor . . . for any portion of the money or property which is requested or demanded." *Id*. § 3729(c) (emphasis added). *See also* S. Rep. No. 110-507, at 15 (2008) ("[L]iability under 3729(a) attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property.").

section . . . .'" *Id*. (emphasis in original). "Rather," the court held, "the statute protects employees who are retaliated against for investigating or prosecuting FCA actions against their employers and third parties." *Id*. Thus, the *Satalich* court held that the plaintiff had adequately stated an FCA retaliation claim by alleging that he was fired after bringing a subcontractor's allegedly fraudulent conduct to the attention of his employer, a municipality. *Id*. *See also Nguyen v. City of Cleveland*, 121 F. Supp. 2d 643, 648-49 (N.D. Ohio 2000) (holding that the FCA "reaches an employer who discriminates against an employee, at the behest of or on behalf of another, when it is the other that seeks to retaliate against the employee for protected conduct"); *United States ex rel. Lang v. Northwestern University*, No. 04 C 3290, 2005 WL 670612, at *2 (N.D. Ill. Mar. 22, 2005) (noting that Section 3730(h) "contains no language requiring proof that the retaliation was for protected activity involving a false claim by [the plaintiff's] employer" and holding that "[t]here is nothing in the language of § 3730(h) that precludes a claim for retaliation in a situation where the employer learns that the employee has engaged in protected activity regarding a false claim by, for example, a related entity . . . , and for that reason terminates the employee.").

Defendant's attempts to circumvent this case-law do not succeed. Defendant cites cases for the proposition that the retaliation provision of the FCA protects only those whistleblowers "who come forward with evidence their *employer* is defrauding the government." Docket No. 70 at 7:12-13 (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269) (emphasis added by Defendant). *See also id*. at 6:12-8:16; Docket No. 72 at 3:12-22 (*citing, inter alia, Mendiondo*, 521 F.3d at 1103-04; *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab*, 275 F.3d 838, 845 (9th Cir. 2002); *Fanslow v. Chicago Mfg. Ctr.*, 384 F.3d 469, 480 (7th Cir. 2004); *Wilkins v. St. Louis*, 314 F.3d 927, 933 (8th Cir. 2002)). These cases do not support Defendant's argument, because not one of them considered the issue at hand—namely, whether "protected activity" under Section 3730(h) requires a showing that the plaintiff reasonably believed that her employer, and *only* her employer, was possibly committing fraud against the government. In its discussion, Defendant repeatedly underlines words and phrases like "defendant," "employer,"

and "their employer," to make it seem, presumably, that the cited cases *did* consider the issue. But this court is not so easily convinced.[4] The issue simply is not addressed in any of Defendant's cases. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Defendant cannot use underlining to transmute an issue that "merely lurk[s] in the record" into one that was actually considered and resolved.

Also, Defendant characterizes *Satalich* and *Nguyen* as applicable only upon an allegation of a conspiracy between the employer and the third party. *See* Docket No. 70 at 8:19-21. This is inaccurate. The *Satalich* plaintiff did "appea[r] to allege" a conspiracy, but this fact did not enter into the court's analysis of the scope of Section 3730(h); it was only mentioned, in *dicta*, as a possible source of motive. *Satalich*, 160 F. Supp. 2d at 1108. Similarly, while *Nguyen* appears to contain facts suggesting concerted action, there is no allegation of conspiracy—indeed, the word "conspiracy" does not even appear in the text of the opinion.[5] At any rate, even if the rules laid down in *Satalich* and *Nguyen* are taken to require an allegation of conspiracy or concerted action, Plaintiff's SAC does allege facts that allow for an inference of some kind of concerted action between BAH and EA. *See* Docket No. 68 at ¶¶ 9-10, 12-13; *cf. Mendiondo*, 521 F.3d at 1104 (dismissal under Rule 12(b)(6) not appropriate where has "sufficient facts to support a cognizable legal theory") (emphasis added). As for *Lang*, that opinion contains no mention of conspiracy or concerted action. As such, Defendant's attempt to distinguish these cases fails.

### iii.   Policy concerns of the False Claims Act

The third reason why Defendant's account of the law is wrong is that it is at odds with the

---

[4] Defendant generally indicated where it had added emphasis, but failed to do so a few times. *See*, *e.g.*, Docket No. 70 at 4:17, 8:11-12; Docket No. 72 at 3:19. These failures are most likely oversights. However, since Defendant's argument on this point is nothing other than selective use of underlining, they could be viewed as serious distortions of case language. Accordingly, Defendant is urged to be more careful in its representations to this court.

[5] In light of this fact, the court does not understand Defendant's assertion that "[t]he decision in *Nguyen*, *supra*, also involved a conspiracy between the employer and a third party." Docket No. 70 at 9:27-28.

Page 9 of 27

policy underlying the FCA. For example, in its Report on the 1986 Amendments to the FCA, the United States Senate opined that

> The "protected activity" under this section includes any "good faith" exercise of an individual "on behalf of himself or others of any option offorded [*sic*] *by this Act*, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this act." Consequently, the Committee believes protection should extend not only to actual *qui tam* litigants, but those who assist or testify for the litigant, as well as those who assist the Government in bringing a false claims action. *Protected activity should therefore be interpreted broadly*.

S. Rep. No. 99-345, at 34 (1986) (emphasis added). More recently, the Senate has expressed its concern that, "[w]ith such a great potential for fraud against the Government, it is important that the [Committee on the Judiciary] revisit the FCA and correct erroneous court interpretations that have limited the scope and application of the FCA in contravention of Congress's intent in passing the 1986 Amendments." S. Rep. No. 110-507, at 6 (2008) (emphasis added). The Senate reiterated these ideas in its March 23, 3009 report on the "Fraud Enforcement and Recovery Act of 2009," wherein it declared its intent to

> improv[e] one of the most potent civil tools for rooting out waste and fraud in Government—the False Claims Act. The effectiveness of the False Claims Act has recently been undermined by court decisions which limit the scope of the law and, in some cases, allow subcontractors paid with Government money to escape responsibility for proven frauds. The False Claims Act must be corrected and clarified in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis.

S. Rep. 111-10 (2009).

In the same vein, the United States House of Representatives has recently expressed its disapproval of "court decisions [that] have created a complex patchwork of procedural and jurisdictional hurdles that have often derailed meritorious actions and discouraged private citizens from filing *qui tam* actions." H.R. Rep. 111-97 (2009). The House stressed the need to "preven[t] dismissals of certain *qui tam* actions" and to "strengthe[n] anti-retaliation protections," noting that such an approach "is particularly relevant during this period of *increased reliance on private contractors to perform what have traditionally been viewed as*

*governmental functions*." *Id*. (emphasis added).

The overall point, then, is that Congress has signaled that the FCA should be interpreted quite broadly so that its protections are put to work. *Cf. Kent*, 836 F. Supp. at 725 ("[A]s the high court has explained, in statutes of this type the remedial purpose of the statute counsels a broad reading. Whistleblower protection statutes are remedial in nature and thus should be liberally construed.") (internal citation omitted) (*citing NLRB v. Hearst Publ'ns*, 322 U.S. 111, 124 (1944)). Though such signals are not statements of law, they are generally relevant to the enterprise of statutory interpretation. *See, e.g.*, *Landgraf v. USI Film Prod.*, 511 U.S. 244, 262-63 (1994). As such, these statements of legislative history constitute additional reasons to reject Defendant's interpretation of the FCA, according to which Plaintiff cannot have engaged in "protected activity" unless she reasonably believed that her *employer*, and not any other party, was the entity committing fraud against the government. That is not the broad, liberal reading that Congress and the Supreme Court have called for.

Thus, the statutory language, the relevant case-law, and the policy concerns underlying the FCA all persuade the court that engaging in "protected activity" under Section 3730(h) means (i) having a reasonable belief that an employer or a related third party was possibly committing fraud against the government, and (ii) investigating that possible fraud.

### 2. On a correct account of the law, Plaintiff has stated a claim under the False Claims Act

Again, "[a] plaintiff alleging a[n] FCA retaliation claim must show three elements: (1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." *Mendiondo*, 521 F.3d at 1103. And, as demonstrated above, engaging in "protected activity" under Section 3730(h) means (i) having a reasonable belief that an employer *or a related third party* was possibly committing fraud against the government, and (ii) investigating that possible fraud.

On that (correct) account of the law, Plaintiff has adequately alleged facts in accordance

with the elements of an FCA retaliation claim. As to element (1), Plaintiff describes her reasonable belief in possibly fraudulent billing activities by both Defendant and its sub-contractor, EA, and her investigations into these activities. *See* Docket No. 68 at ¶¶11-14. Though most of Plaintiff's allegations focus on EA's activities, Plaintiff also clearly alleges that, at some time between January and April of 2006, she discovered evidence that BAH had over-billed the USAF. *Id*. at ¶12. This evidence took the form of "invoices indicat[ing] that the actual hours of fieldwork did not match the amount charged for the fieldwork." *Id*. As to element (2), Plaintiff states that she presented the findings of her investigations to her employer on May 11, 2006. *See id*. at ¶14. This allegation sufficiently pleads that her employer knew she was engaged in protected activity. *See Mendiondo*, 521 F.3d at 1104. Finally, as to element (3), Plaintiff states that Defendant terminated her because she "investigated, reported, complained about, took actions to expose, and refused to cover up [Defendant's] billing practices amounting to fraud against the United States government." Docket No. 68 at ¶19. At the pleading stage of an FCA case, it suffices for a plaintiff to simply give notice that she believes she was terminated because of her investigations into the practices specified in the complaint. *See Mendiondo*, 521 F.3d 1104.

### 3. Even on Defendant's incorrect account of the law, Plaintiff has stated a claim under the False Claims Act

Even if it were the case that Plaintiff could not have engaged in "protected activity" unless she reasonably believed that *her employer*, and not any other party, was the entity committing fraud against the government, the court still finds that Plaintiff has stated a retaliation claim under the FCA. This is because, as stated above, Plaintiff clearly alleges that, at some time between January and April of 2006, she discovered evidence that BAH itself had over-billed the USAF, that she brought this fact to their attention, and that she was terminated for doing so. Docket No. 68 at ¶12. Her evidence consists of "invoices indicat[ing] that the actual hours of fieldwork did not match the amount charged for the fieldwork." *Id*.

1    Defendant labels this allegation "conclusory."  *See*, *e.g.*, Docket No. 70 at 5:12.  The court

2    disagrees with this label.  In the legal context, the term "conclusory" means "expressing a factual

3    inference without expressing the fundamental facts on which the inference is based."  Bryan A.

4    Garner, Modern Legal Usage 191 (2d ed. 1995).  Here, Plaintiff's allegation is not conclusory

5    because it expresses a factual inference (that BAH over-billed the USAF) *and* expresses the

6    fundamental facts on which that inference is based (that, as shown by certain invoices, the actual

7    hours of work did not match the amount charged for the work).

8    Moreover, contrary to Defendant's assertions—*see*, *e.g.*, Docket No. 70 at 5

9    n.1—Plaintiff's discovery responses support this allegation.  For example, in her interrogatory

10   responses, Plaintiff states: "[BAH employee] James Rosacker was copied on all these emails, and

11   he was aware of the billing problems I discovered.  *Rosacker made changes to Task Order 14*

12   (see mod 2) *dated 26 August 2004 which resulted in an additional $252,000 payment to EA for a*

13   *site* (AOC 81) *for which EA had not performed the work claimed in the payment request*."

14   Docket No. 70, Exh. 1, at 2 (emphasis added).  By ascribing a causal role to a BAH employee in

15   a particular instance of over-billing, this response states the specific facts underlying the assertion

16   that BAH over-billed the USAF.

17   At any rate, the court rejects the contention that, in this pre-discovery stage of the

18   proceedings, Plaintiff should somehow have evidence at hand to support her claims.  Generally, a

19   Rule 12(b)(6) motion precedes any discovery by plaintiff, as the very "purpose of [the motion] is

20   to enable defendants to challenge the legal sufficiency of complaints *without subjecting*

21   *themselves to discovery*."  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir.

22   1987) (emphasis added).  Similarly, in its May 5, 2009 report on the "False Claims Correction

23   Act of 2009," the United States House of Representatives expressed alarm that

24   [i]n False Claims Act suits . . . many courts have required a degree
     of specificity that is not only beyond what is necessary to give
25   defendants notice of the charges against them *but goes far beyond*
     *the information readily available at the pleading stage to many* qui
26   tam *relators with meritorious allegations.  A relator may have*
     *knowledge of the method of fraud employed, for example, but not*
27   *be in possession of detailed records documenting precisely how the*

28

Page 13 of 27

1    *fraud was executed.* Courts have nevertheless ruled against
     relators who could not provide the false invoices or phoney billing
2    records, even though they are not generally available to anyone
     outside a company's billing department—often without even
3    providing an opportunity for discovery.

4    H.R. Rep. 111-97 (2009) (footnote omitted; emphasis added).[6] Obviously, this case is still in the

5    pleading stage.  Plaintiff thus cannot realistically be expected to "be in possession of detailed

6    records documenting precisely how the [alleged] fraud was executed."

7            In sum, Defendant's account of the law is incorrect.  On a correct account of the law,

8    Claim 1 clearly states a claim upon which relief may be granted.  Moreover, Claim 1 is

9    adequately alleged even on Defendant's incorrect account of the law.  As such, Defendant's

10   argument fails as to Claim 1.  The claim is adequately alleged.

11           **B.**     **Claim 2, Wrongful Termination in Violation of Public Policy, Is Plausible**
                        **and Therefore Adequately Alleged**
12

13           Defendant also maintains that Claim 2 should be dismissed because it fails to state a

14   claim upon which relief may be granted.  *See*, *e.g.*, Docket No. 70 at 10:26-11:11.  The court

15   again disagrees.  California law guides the court's choice-of-law analysis, which indicates that

16   California law should apply to Claim 2 unless Guam law "materially differs" from California law

17   on the relevant point.  Under Ninth Circuit law, Guam law does not materially differ from

18   California law in this manner.  Thus, California law applies, and Plaintiff has adequately stated a

19   claim for relief under California law.  As such, Defendant's argument fails as to Claim 2.

20           **1.     California law guides the court's choice-of-law analysis**

21           The threshold question is what body of law controls that second claim—California's, or

22   Guam's.  Plaintiff argues the former, while Defendant argues the latter (though both also offer in-

23   the-alternative analyses).  *Compare* Docket No. 71 at 9:5-6 *with* Docket No. 72 at 5:7-28.

24           The first step in answering this threshold question is to identify the proper choice-of-law

25   rule.  *See* Restatement (Second) of Conflict of Laws §§ 2-7 (1971).  A federal court sitting in

26

27           _____

28           [6]  While Plaintiff is not a *qui tam* relator, the court believes that the same concerns apply here.

diversity applies the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (same). However, when a Section 1404(a) transfer is granted on the defendant's motion, "the transferee court must follow the choice-of-law rules of the transferor court." *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 965 (9th Cir. 1993) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)). This is because "a change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Van Dusen*, 376 U.S. at 639. *See also Ferens v. John Deere Co.*, 494 U.S. 516, 524-25 (1990) ("choice-of-law rules should not change following a (Section 1404) transfer initiated by a defendant"); *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) (same); *Newton v. Thomason*, 22 F.3d 1455, 1459 (9th Cir. 1994) (same); *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1191 (S.D. Cal. 2007) (same). Since this case was transferred from the Central District of California to this court by Defendant's Section 1404 motion, then, California law should guide the court's choice-of-law analysis.

Defendant does not seem to agree that California law should guide the court's choice-of-law analysis. *See*, *e.g.*, Docket No. 72 at 6:3-4. However, Defendant makes no good argument against this result. First, Defendant puts heavy emphasis on the word "generally" in *Van Dusen*'s formulation of the principle that "a change of venue under § 1404(a) *generally* should be, with respect to state law, but a change of courtrooms." *See* Docket No. 72 at 4:28-5:6 (discussing *Van Dusen*, 376 U.S. at 639)) (emphasis added).[7] Defendant insists that this adverb is a "very important" limitation. *Id.* at 5:4. While that may be, it is a limitation that deals with issues not present here—namely, *forum non conveniens* and lack of personal jurisdiction.[8] *See Van Dusen*,

---

[7] Defendant also mistakenly attributes the following sentence to *Van Dusen*: "[g]enerally, where a defendant in a diversity case obtains a transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." Docket No. 72 at 4:28-5:2. This sentence does not appear in *Van Dusen*.

[8] *Van Dusen* also suggests that another limitation on its principle might be the procedural variant of a Section 1404 transfer made on *a plaintiff's motion*. *Van Dusen*, 376 U.S. at 640. However, the Court has since decided that the *Van Dusen* principle applies "regardless of who makes the § 1404(a) motion." *Ferens*, 494 U.S. at 531.

376 U.S. at 640. Second, Defendant appears to suggest that *Van Dusen* and its progeny are inapplicable "because the connection between the facts of the case and the laws of the State of California are [*sic*] so minimal." Docket No. 72 at 5:7-9. But it is not clear what relevance this statement has for the selection of the applicable choice-of-law rule, since the cases state in "bright line" manner that "choice-of-law rules should not change following a (Section 1404) transfer initiated by a defendant." *Ferens*, 494 U.S. at 525. If anything, the statement might be relevant to the (later) selection of the applicable *substantive* law. But that is a separate issue, and it is wrong to run the two issues together. Third, BAH claims that it "has fully briefed the Court on the myriad cases that enable this Court to apply Guam's substantive law to Plaintiff's SAC." Docket No. 72 at 5:20-22. Again, this point is not relevant here. The court has no doubt that it may *ultimately* apply Guam's substantive law to Plaintiff's second claim for relief; the question at the outset, though, is what choice-of-law rule to adopt in order to properly determine which jurisdiction's substantive law applies. And of BAH's "myriad" cases, not one shows a transferee court applying the choice-of-law rule of its forum state in order to resolve a choice-of-law issue. Thus, the cases are all off-point.[9]

In sum, given the mass of cases indicating that "choice-of-law rules should not change following a (Section 1404) transfer initiated by a defendant" and Defendant's inability to explain why those cases should not apply here, California law will guide the court's choice-of-law analysis.

**2.      Choice-of-law analysis indicates that California law should apply unless Guam law "materially differs" from California law**

Under the first step of California's approach to choice-of-law analysis, "the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must

---

[9] Defendant's two principal cases here—*Jenkins v. Armstrong World Indus., Inc.*, 643 F. Supp. 17 (D. Idaho 1985), *vacated by* 820 F.2d 329 (9th Cir. 1987), and *Les Schwimley Motors, Inc. v. Chrysler Motors Corp.*, 270 F. Supp. 418 (E.D. Cal. 1967)—are also of highly questionable value. *See, e.g.*, *Gallagher v. Allied Weldery, Inc.*, 972 F.2d 1339 (9th Cir. 1992) (Table) (criticizing appellant for relying on *Jenkins* because it had been vacated); 15 Charles Alan Wright et al., Federal Practice & Procedure § 3846 n. 25 (finding *Les Schwimley Motors* "persuasively criticized" in 56 Geo. L.J. 1004 (1968)). A Westlaw citation search shows that both cases are dead as precedent.

1   show it materially differs from the law of California." *Washington Mutual Bank, FA v. Superior*

2   *Court*, 15 P.3d 1071, 1080 (Cal. 2001).[10]  If the applicable rules of law do not "materially

3   diffe[r]," the analysis ends—"there is no problem and the trial court may find California law

4   applicable to [the claim]." *Id.*

5          As Defendant makes clear, the applicable rules of law are the at-will employment

6   doctrines of California and Guam.  *See* Docket No. 72 at 6:1-9:12.  The point on which it must

7   be determined whether these rules materially differ is whether both doctrines admit of a "public

8   policy exception."  Defendant does not dispute that California law recognizes such an exception,

9   but vigorously argues that Guam law does not recognize it.  *See id.*[11]  Plaintiff argues, just as

10  vigorously, that Guam law does recognize such an exception—or, at least, should be taken to do

11  so under Ninth Circuit law.  *See* Docket No. 71 at 13:24-16:22.  Thus, the question at this point

12  is whether Plaintiff is right.  If so, California law applies, under *Washington Mutual Bank*; if not,

13  the choice-of-law analysis continues.

14              **3.    Under Ninth Circuit law, Guam law should be taken to recognize a
                        public policy exception to the at-will employment doctrine, so it does
15                      not "materially differ" from California law**

16         Both Plaintiff and Defendant acknowledge that the Supreme Court of Guam has not

17  decided whether Guam law recognizes a public policy exception to the at-will employment

18  doctrine.[12]  *See, e.g.*, Docket No. 71 at 13:25-26; Docket No. 72 at 7:15-18.

19  _____

20      [10]  In its discussion of California's approach to choice-of-law analysis, Defendant cites *Hite v. Triton Energy*
        *Ltd.*, 35 Fed. Appx. 434 (9th Cir. June 5, 2002) (unpublished).  *Hite*, as an unpublished order issued before January 1,
21      2007, should not be cited to this court.  *See* 9th Cir. R. 36-3(c).

22      [11]  Of course, the court realizes that Defendant *does* dispute that Plaintiff has successfully stated a claim under
        the public policy exception to the at-will employment doctrine.  *See* Docket No. 72 at 7:23-9:12.  The court will come
23      to that challenge later; here, it simply points out that Defendant does not deny that such an exception exists under
        California law.

24
        [12]  Defendant states that "[t]he Supreme Court of Guam [has] declined to adopt the argument being made by
25      the Plaintiff in the case at bar . . . ."  Docket No. 72 at 7:11-12 (*citing Quijano v. Atkins-Kroll, Inc.*, 2008 Guam 14 ¶
        30).  However, the cited case only shows the Supreme Court of Guam declining to adopt a rule that would "create for-
26      cause employment rights based only on evidence of raises, promotions and benefits."  *Id*.  That particular rule is
        considerably narrower than the public policy exception, and considerably more burdensome on employers, such that its
27      rejection is not relevant to the court's analysis.  However, the *Quijano* court even suggests, in *dicta*, that a public policy
        exception might apply to Guam's at-will employment statute.  *See id.* ¶ 7 (stating that the at-will presumption of Section

28

                                              Page 17 of 27

"When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a *reasonable determination* of the result the highest state court would reach if it were deciding the case." *Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002) (emphasis added); *see also Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n. 7 (9th Cir. 2000) (same); *Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993) (same). To make such a "reasonable determination," the federal court looks to "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *McCoy v. Chase Manhattan Bank, USA*, 559 F.3d 963, 970 (9th Cir. 2009); *see also Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995); *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (same). As there are no intermediate appellate courts in Guam, the court will look only to decisions from other jurisdictions, statutes, treatises, and the like, giving special weight to decisions from other jurisdictions. *See Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 644 (7th Cir. 2002) (Posner, J.) ("When state law on a question is unclear . . . , the best guess is that the state's highest court, should it ever be presented with the issues, will line up with the majority of the states.").

The court finds that the Supreme Court of Guam would probably hold that Guam law recognizes a public policy exception to the at-will employment doctrine because most other United States jurisdictions have recognized such an exception. For example, *forty-three* states recognized the exception as of October 1, 2000. *See* Charles J. Muhl, "The Employment-at-will Doctrine: Three Major Exceptions," Month. Lab. Rev., Jan. 2001, at 3, 4, *available at* http://www.bls.gov/opub/mlr/2001/01/art1full.pdf.[13] As for island territories of the United States, Puerto Rico and the U.S. Virgin Islands have gone beyond the public policy exception by

---

55404 of Guam Code Title 18 "has been subject to several limitations," and citing *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1100 (Cal. 2000), which discusses various limitations on at-will employment).

[13] The only states not recognizing the exception were Alabama, Florida, Georgia, Maine, Nebraska, New York, and Rhode Island. *Id*.

providing *statutory* protection from arbitrary discharge, in the form of laws allowing for termination of private employees only upon a showing of just cause. *See* P.R. Laws Ann. tit. 29, § 185a (2006); V.I. Code Ann. tit. 24, §§ 76-79 (2007). *See also* 82 Am. Jur. 2d Wrongful Discharge §§ 53-63; Mark A. Rothstein et al., 2 Employment Law § 9:1; 1 Williston on Contracts § 4:23.

Further, as Plaintiff points out, the Guam Legislature has enacted a whistleblower protection scheme at Sections 4501 through 4507 of Title 4, Guam Code Annotated. *See* Docket No. 71 at 16:8-20 (*citing* 4 Guam Code Ann. §§ 4501-05).[14] The court recognizes that this scheme protects public employees,[15] while Defendant is a private employer. Still, the Guam Legislature has stated that "[Government of Guam] employees should be encouraged to disclose information on actions of agencies that are not in the public interest and that legislation is needed to ensure that any employee making such disclosures shall not be subject to disciplinary measures or harassment by any public official." 4 Guam Code Ann. § 4501. The court considers this to be relevant evidence of Guam's public policy, and therefore an indication that the Supreme Court of Guam would be inclined to protect from retaliation employees who find themselves in circumstances similar to those alleged in Plaintiff's SAC.

Defendant points out that neither the Supreme Court of Guam nor the Guam Legislature has explicitly recognized a public policy exception to the at-will employment doctrine, and then argues that such facts constitute determinative evidence that Guam law should not be taken to recognize such an exception. *See* Docket No. 72 at 7:13-20. For that kind of reasoning to be

---

[14] Defendant asserts that the court may not consider the import of these statutes because Plaintiff did not cite them in her SAC. *See* Docket No. 72 at 7 n.2. However, Plaintiff has not cited the statutes as ones that somehow directly authorize her claims for relief (in which case Defendant's assertion might be valid). Rather, she has adduced them as evidence that may be useful in making the "reasonable determination" called for under *Medical Laboratory Management Consultants*. 306 F.3d at 812. Again, to make such a determination, a federal court looks to "intermediate appellate court decisions, decisions from other jurisdictions, *statutes*, treatises, and restatements as guidance." *McCoy*, 559 F.3d at 970 (emphasis added). Nowhere does *McCoy*, or any other case, say that these "guidance" materials must be cited in the underlying complaint. Indeed, such a requirement would transform the complaint into a legal brief, and would therefore be fundamentally at odds with the "short and plain statement of the claim" style contemplated by the Federal Rules of Civil Procedure. *See, e.g.*, Fed. R. Civ. P. 8(a).

[15] It is not, however, limited to classified employees.

Page 19 of 27

cogent, though, the operative rule would have to be something like: "when a decision turns on applicable state law and the state's highest court has not adjudicated the issue and its legislature has not addressed it, a federal court should take that judicial and legislative silence as evidence of rejection of that particular rule of law." But the operative rule is different: "[w]hen a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a *reasonable determination* of the result the highest state court would reach if it were deciding the case," relying on "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements" to do so. *Medical Lab. Mgmt. Consultants*, 306 F.3d at 812 (emphasis added); *McCoy*, 559 F.3d at 970. Silence is not contemplated as evidence bearing on the federal court's "reasonable determination" of what a state court or legislature would do. The court thus rejects this argument.

In sum, based on the "decisions from other jurisdictions, statutes, treatises, and restatements" that it has considered on this point, the court finds that the Supreme Court of Guam would probably hold that Guam law recognizes a public policy exception to the at-will employment doctrine. Since California law also recognizes a public policy exception to the at-will employment doctrine, Defendant has failed to show that Guam law "materially differs from the law of California." *Washington Mutual Bank*, 15 P.3d at 1080. Thus, "there is no [choice-of-law] problem and the trial court may find California law applicable to [the claim]." *Id*.

### 4.    Plaintiff states a claim for relief under California law

Under California law, "an employer's right to discharge an at-will employee is subject to limits that fundamental public policy imposes." *Green v. Ralee Engineering Co.*, 960 P.2d 1046, 1048 (Cal. 1998) (*citing Tameny v. Atlantic Richfield Co.*, 610 P.2d 1330, 1332-33 (Cal. 1980)). "[A]t-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy." *Id*. In virtue of their provenance, such tort claims are also known as "*Tameny* claims." To support a *Tameny* claim, the public policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the

Page 20 of 27

individual; (3) well established at the time of discharge; and (4) substantial and fundamental."

*City of Moorpark v. Superior Court*, 959 P.2d 752, 762 (Cal. 1998) (internal quotation omitted).

For instance, it is established that a complaint states a *Tameny* claim when it alleges (1) that the plaintiff was employed by the defendant; (2) that the defendant terminated the plaintiff's employment; (3) that the plaintiff had a reasonably based suspicion that the defendant and/or a third party were engaged in fraudulent billing activities; (4) that plaintiff's act of reporting of his/her reasonably based suspicion was a motivating reason for the plaintiff's discharge; and (5) that being fired caused the plaintiff harm. *See Casella v. SouthWest Dealer Servs., Inc.*, 69 Cal. Rptr. 3d 445, 455 (Cal. Ct. App. 2007) (*following* Judicial Council of Calif. Civil Jury Instr'n No. 2430, "Wrongful Discharge / Demotion in Violation of Public Policy").

In *Casella*, plaintiff Zachary Casella worked for defendant SouthWest Dealer Services, Inc. ("SouthWest") as a sales representative, selling aftermarket car products to car dealerships. 69 Cal. Rptr. 3d at 449. One of SouthWest's customers was the Spreen family of dealerships. *Id.* One of Casella's duties was to create certain written reports for the Spreen dealerships. *Id.* Shortly after learning how to create these written reports, Casella realized that the Spreen dealerships were quoting artificially inflated base sales prices to their customers in order to entice them to buy aftermarket products that Spreen would offer at artificially low prices—a process called "payment packing"—and that one of the purposes of his written reports was to quantify and keep track of Spreen's payment packing. *Id.* at 449-50. In January of 2003, Casella talked with some of his superiors at SouthWest about his concerns, stating that "he was concerned because he thought there 'was some type of payment packing going on' at the Spreen dealerships which might be illegal." *Id.* at 450. Shortly thereafter, he was fired. *Id.* at 451.

Casella went to trial on a complaint naming SouthWest and its president as defendants. 69 Cal. Rptr. 3d at 448. The complaint alleged, *inter alia*, that his employment was wrongfully terminated in violation of public policy "because he reported his belief that SouthWest was

1   participating in certain of its clients' illegal payment-packing schemes."[16] *Id*. at 451. It also

2   "alleged [that] SouthWest's conduct was illegal, citing several state and federal statutes." *Id*.

3   After 23 days of trial, including 19 days of testimony, the jury found for Casella on all claims.

4   *Id*. at 452. Along the way, the trial court denied the defendants' demurrer, motion for summary

5   adjudication, motion for judgment *non obstante veredicto*, and motion for new trial. *Id*. at 451-

6   52. The defendants appealed. *Id*. at 452.

7        On appeal, the defendants challenged the verdict on the *Tameny* claim by arguing that

8   "the public policy at issue was not tethered to a constitutional or statutory provision." 69 Cal.

9   Rptr. 3d at 453. The court of appeal rejected this argument. *Id*. at 458. First, it noted that

> [t]he jury was instructed with a modified version of [Judicial Council of California Civil Jury Instruction ] No. 2430 which stated that in order to establish wrongful termination in violation of public policy, Casella had to prove: (1) he was employed by SouthWest; (2) SouthWest terminated Casella's employment; (3) Casella had a reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in fraudulent activities; (4) the reporting by Casella of his reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in fraudulent activities was a motivating reason for Casella's discharge; and (5) the discharge caused Casella harm.

16   *Id*. at 455 n.4 (emphasis added). Next, it noted that "[t]erm 'fraudulent activities' was defined

17   for the jury based on [California] Penal Code section 487 and its then-corresponding jury

18   instruction, [California Jury Instructions–Criminal] No. 14.05 . . . ." *Id*. Finally, the court noted

19   that the jury was also instructed on aiding and abetting. *Id*. On the basis of these three facts, the

20   court of appeal held that "the policy underlying Casella's claim was indeed tethered to a statute."

21   *Id*. at 456.

22       *Casella* thus establishes that a *Tameny* claim lies on any complaint making allegations

23   that would support the jury instructions given in *Casella*. In this case, Plaintiff's complaint

24   alleges (1) that she was employed by BAH; (2) that BAH terminated her employment; (3) that

---

26     [16] Defendant may argue that this statement indicates that, under *Casella*, Plaintiff's SAC must allege that BAH

27   was participating in EA's fraudulent billing activities. As stated above, though, Plaintiff's SAC alleges facts from which one could infer concerted action between BAH and EA. *See* Docket No. 68 at ¶¶ 9-10, 12-13; *cf. Mendiondo*, 521 F.3d at 1104

1  Plaintiff had a reasonably based suspicion that BAH and EA were engaged in fraudulent billing

2  activities; (4) that Plaintiff's act of reporting of her reasonably based suspicion was a motivating

3  reason for her discharge; and (5) that being fired caused Plaintiff harm. *See* Docket No. 68 at

4  ¶¶ 6 (employment with BAH); 14 (termination); 8-12 (reasonably based suspicion of fraudulent

5  billing activities by BAH and/or EA); 13, 19 & 26 (reporting of suspicion as motivating reason

6  for discharge); 20, 26-29 (harm to Plaintiff). These allegations, if true, would support the jury

7  instructions given in *Casella*. And, again, Plaintiff also alleges facts that would support an

8  aiding and abetting instruction, insofar as they suggest some level of concerted action between

9  BAH and EA.[17] *See id.* at ¶¶ 9-10, 12-13. Thus, under *Casella*, Plaintiff's SAC states a claim for

10  wrongful discharge in violation of public policy.

11       Defendant argues that *Casella* is inapposite because the wrongful termination claim in

12  that case "was premised on an alleged violation of [California] Penal Code § 487," while

13  Plaintiff's SAC lacks allegations that BAH violated Section 487. Docket No. 72 at 9:2-5. The

14  court rejects this argument for at least three reasons.

15       First, there is no evidence to support the statement that the wrongful termination claim in

16  *Casella* "was premised on an alleged violation of Penal Code § 487." The text of the opinion

17  only indicates that Section 487 was used to define "fraudulent activities" for the jury; it does not

18  say that the plaintiff's claim was "premised on" that statute in any way. More to the point, there

19  is no indication that the complaint in *Casella* made any reference to Section 487.

---

21      [17] Defendant may argue that *Casella* is inapposite because Plaintiff's SAC does not specifically allege any aiding and abetting. However, there is no indication that the complaint in *Casella* alleged aiding and abetting. In fact, there is evidence that this theory was added at trial. *See Casella*, 69 Cal. Rptr.3d at 458 ("The court further stated, '[i]f this case goes to a jury, and if it goes to the jury on 2430, it's got to go on fraud and aiding and abetting.'").

23      Also, in the criminal context, each charging document is read to include an aiding and abetting charge. Thus, "aiding and abetting liability is embedded in every California information," and need not be specifically charged. *United States v. Reveles-Espinoza*, 522 F.3d 1044, 1048 (9th Cir. 2008) (*citing* Cal. Penal Code § 971). Likewise, "aiding and abetting is embedded in every federal indictment for a substantive crime." *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005) (*citing*, *inter alia*, 18 U.S.C. § 2). Although this obviously is not a criminal case, the court does not see why it would be problematic to apply similar reasoning here, particularly since the presumptions and proof rules set up to protect criminal defendants are more stringent than those set up to protect civil defendants. Moreover, Defendant is not charged with any crime. The only reason criminal statutes are at all relevant here is that they are taken to put a defendant on notice of what California public policy is, and which aspects thereof may be implicated by firing a plaintiff. *See Green*, 960 P.2d at 1049.

Second, even if the *Casella* plaintiff's wrongful termination claim truly were "premised on" Section 487—in the sense that he cited that statute in his complaint as a relevant indicator of public policy—there is no indication that this fact was analytically important, since the court of appeal did not mention it in its analysis.

Third, even if the *Casella* plaintiff's wrongful termination claim truly were "premised on" Section 487 *and* this fact somehow were analytically important, the ensuing requirement would be satisfied by Plaintiff's citation of California Penal Code Section 484 in her SAC. *See* Docket No. 68 at ¶ 24. Indeed, Section 484 is broader than Section 487, in that Section 484 defines and criminalizes theft *in general*, while Section 487 defines "grand theft" as a species of theft. *Compare* Cal. Penal Code § 484 (West 2009) *with id*. § 487; *cf. id*. § 486 (dividing theft "into two degrees," grand theft and petty theft). And, as stated in footnote 17, *supra*, the only reason criminal statutes are at all relevant in wrongful termination cases is that they are taken to put a defendant on notice of what California public policy is. *See Green*, 960 P.2d at 1049. Section 484, being broader than Section 487, does a better job at this notice-giving, and so is, in this regard, substantively "better" than Section 487.

Defendant also argues that "Plaintiff's public policy claim fails because the SAC is void of any factual allegations establishing that BAHI contravened the letter of the different California statutory provisions relied on by Plaintiff." Docket No. 72 at 9:9-11. The court rejects this argument for two reasons.

First, the court disagrees that the SAC is "void of" such allegations. The allegations in Paragraphs 9 through 13, if true, would likely establish that BAH had violated Section 484 of the California Penal Code. *See* Docket No. 68 at ¶¶ 9-13.

Second, this argument assumes a standard that does not apply: the viability of Plaintiff's public policy claim does not turn on whether Defendant "contravened the letter of" any particular California statute. To prove wrongful termination in violation of public policy, "an employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity." *Green*, 960 P.2d at 1059. It follows that a

complete for wrongful termination in violation of public policy need not allege any actual

violation of law, only facts supporting "reasonably based suspicions" of illegal activity.[18]  *Id*.  *See*

*also Freund v. Nycomed Amersham*, 347 F.3d 752, 759 (9th Cir. 2003) (applying California law)

(rejecting argument that wrongful termination claim requires showing of actual violation of rule

cited as basis of public policy).  As discussed, Plaintiff has alleged such facts.

Defendant also argues that the *Tameny* claim fails because "plaintiffs should not be

permitted to end run around the statutory and procedural requirements of the [FCA]."  Docket

No. 72 at 8:1-2 (*discussing Campbell v. Aerospace Corp.*, 123 F.3d 1308 (9th Cir. 1997)).  *See*

*also* Docket No. 70 at 15:7-17:8.  This argument is incomprehensible.  Defendant does not

explain *how* Plaintiff's *Tameny* claim constitutes an "end run around the statutory and procedural

requirements of the FCA"—or, alternatively, an "attemp[t] to 'backdoor' a state public policy

claim to avoid the provisions of the [FCA]."  Docket No. 70 at 16:21-22.  To the extent it asserts

that the FCA preempts *Tameny* claims, this argument is rejected.  *See Hoefer v. Fluor Daniel,*

*Inc.*, 92 F. Supp. 2d 1055, 1059 (C.D. Cal. 2000) (holding, on reconsideration, that the FCA does

not preempt *Tameny* claims for whistleblower protection); *see also Palladino ex rel. United*

*States v. VNA of Southern N.J.*, 68 F. Supp. 2d 455, 465-69 (D.N.J. 1999) (holding that the FCA

does not preempt New Jersey's Conscientious Employee Protection Act).  And, to the extent it

asserts that *Campbell* somehow bars Plaintiff's *Tameny* claim, this argument is rejected.

*Campbell* held that while the FCA may constitute a source of public policy for a *Tameny* claim,

its citation as such does not implicate a "substantial, disputed question of federal law" sufficient

to maintain federal question jurisdiction under Section 1331 of Title 28, United States Code.  *See*

_____

[18]  This reasoning disposes of Defendant's related point that "the allegations of the proposed SAC do not satisfy [California Penal Code Section 484], which requires an intent to steal."  Docket No. 70 at 17:18-19.  Defendant also argues that Section 484 should not apply because, "by its own terms, [it] only applies to personal property."  *Id*.  Setting aside the fact that Plaintiff need not prove "an actual violation of law," this assertion is blatantly false: beyond "personal property," Section 484 clearly applies to "money," "labor," "real property," "credit," and the "service of another."  Cal. Penal Code § 484 (West 2009).  Again, Defendant is urged to be more careful in its representations to this court.

1    *Campbell*, 123 F.3d at 1314-15. *Campbell* is off-point and not helpful.[19]

2        Finally, Defendant argues that "the proposed SAC [*sic*] also fails to state a claim because

3 the claims for emotional distress *damages* alleged by Plaintiff . . . are subject to the exclusive

4 remedy provisions of either the Guam workers [*sic*] compensation laws or the California workers

5 [*sic*] compensation laws . . . ." Docket No. 70 at 17:26-20:28; Docket No. 72 at 9:15-10:10

6 (emphasis added). The court rejects this argument for two reasons.

7        First, as a threshold matter, it is irrelevant even if correct, because "a Rule 12(b)(6)

8 motion 'will not be granted merely because [a] plaintiff requests a remedy to which he or she

9 [may not be] entitled.'" *Massey v. Banning Unified School Dist.*, 256 F. Supp. 2d 1090, 1092

10 (C.D. Cal. 2003) (*quoting* Schwarzer et al., Rutter Group Practice Guide: Federal Civil Procedure

11 Before Trial § 9:230).

12        Second, it is incorrect. As Plaintiff has noted, "[i]n each case cited by BAH [in support

13 of this argument], the court dismissed *tort claims alleging intentional infliction of emotional*

14 *distress* under worker's compensation exclusivity." Docket No. 71 at 17:25-27 (emphasis in

15 original) (*citing Miklosy v. Regents of Univ. of Cal.*, 188 P.2d 629, 645-46 (Cal. 2008),

16 *Shoemaker v. Myers*, 801 P.2d 1054, 1069 (Cal. 1990), *and Chmielewski v. Target Corp.*, No.

17 B199456, 2008 WL 2042611, at *3 (Cal. Ct. App. May 14, 2008)). A *Tameny* claim is not the

18 same thing as a claim for intentional infliction of emotional distress. Thus, Defendant's cited

19 cases do not support its argument.[20]

20        In sum, California law guides the court's choice-of-law analysis, which indicates that

21 California law should apply to Claim 2 unless Guam law "materially differs" from California law

22

23

24     [19] Defendant also seems to argue that the *Tameny* claim fails insofar as it relies on the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, as its "source" of public policy. *See* Docket No. 70 at 15:2-8 & 17:7-8. The court passes over this argument, since its analysis does not depend on the FCA being a valid source of public policy for a *Tameny* claim.

25

26     [20] In fact, Defendant's cited cases actually—and clearly—undermine its argument. *See, e.g.*, *Miklosy*, 188 P.2d at 646 (noting that "exception for conduct that 'contravenes fundamental public policy' [permits] a *Tameny* action to

27 proceed despite the workers' compensation exclusive remedy rule"). Defendant is, once again, urged to be more careful in its representations to this court.

28

on the relevant point.  Under Ninth Circuit law, Guam law does not materially differ from California law in this manner.  Thus, California law applies, and Plaintiff has adequately stated a claim for relief under California law.  As such, Defendant's argument fails as to Claim 2.  The claim is adequately alleged.

## VI.    CONCLUSION

Defendant has not persuaded the court to dismiss the SAC.  Its argument as to Claim 1 fails because—as shown by an analysis of the statutory language, relevant case-law, and policy concerns underlying the FCA—its account of the law is incorrect.  On a correct account of the law, Claim 1 clearly states a claim upon which relief may be granted.  Moreover, Claim 1 is adequately alleged even on Defendant's incorrect account of the law.

Similarly, Defendant's argument as to Claim 2 fails.  California law guides the court's choice-of-law analysis, which indicates that California law should apply to Claim 2 unless Guam law "materially differs" from California law on the relevant point.  Under Ninth Circuit law, Guam law does not materially differ from California law in this manner.  Thus, California law applies, and Plaintiff has adequately stated a claim for relief under California law.

For these reasons, the court **DENIES** Defendant's motion to dismiss Plaintiff's SAC.  Defendant is directed to answer Plaintiff's SAC by June 19, 2009.[21]

**SO ORDERED**.



/s/ **Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Jun 09, 2009**

---

[21] *See* Fed. R. Civ. P. 12(a)(4)(A).

Page 27 of  27