**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM**

| | |
|---|---|
| **SURENDRANI HILL**, | |
| Plaintiff, | Civil Case No. 07-00034 |
| vs. | |
| **BOOZ ALLEN HAMILTON, INC.**, and **DOES 1–10,** inclusive, | **ORDER RE: MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

1  Before the court is a Motion for Summary Judgment ("the Motion") filed by Defendant Booz
2  Allen Hamilton, Inc ("BAH"). *See* ECF No. 104. Pursuant to Federal Rule of Civil Procedure 56,
3  BAH moves for summary judgment on all claims set forth in the Second Amended Complaint
4  ("SAC"). After hearing argument from the parties on September 16, 2011, and reviewing the
5  relevant filings, case law, and statutes, the court hereby **DENIES** the Motion for the reasons stated
6  herein.

7  **I.   FACTUAL BACKGROUND**

8      **A.   PLAINTIFF TRANSFERS TO GUAM**

9  On May 19, 2003, BAH hired Plaintiff Surendrani Hill ("Plaintiff") to provide support
10 services for Norton and March Air Force Bases in California. SAC, ECF No. 68 ¶ 6. After working
11 for BAH for a little over two years, Plaintiff transferred to Guam in June 2005 and was assigned as
12 a Global Engineering Integration and Technical Assistance ("GEITA") contractor for Anderson Air
13 Force Base ("AAFB"). *Id.* ¶¶ 6, 7.

1    During her tenure on Guam, Plaintiff's boss at BAH was James Rosacker ("Rosacker"). *See* Pl.'s Opp'n, ECF No. 113 at 7. From May 1996 to February 2000, Rosacker held a position similar to Plaintiff's GEITA position in which he oversaw the work of EA Engineering ("EA"). Rosacker Decl. ¶ 5, ECF No. 105, Exh. 3. Rosacker "had extensive experience with EA and had developed a very good relationship with them over the years." *Id.* ¶ 9.

Plaintiff's immediate supervisor on Guam was Romeo Miranda ("Miranda"). *See id.* ¶ 14; Civille Decl., Exh. 4 at 2, ECF No. 114-13.

### B.    PLAINTIFF'S JOB RESPONSIBILITIES

The Installation Restoration Program ("IRP") is a United States Environmental Protection Agency ("EPA") program "through which military dump sites and spill sites which existed prior to 1982 are identified and studied to determine if they pose a risk to humans or the environment." Agar Decl. ¶ 4, ECF No. 113-1. The Air Force hires contractors to study, clean up, monitor, and close the IRP sites. *Id.* ¶ 5. In 2004, EA was the contractor for all 78 IRP sites on AAFB. *See id.* ¶¶ 7, 11, 12.

As the IRP-sites contractor, "EA was required to provide a schedule containing information, for each site, from start to finish, setting forth the mobilization dates, date of Air Force draft report, Agency draft Report and Final Reports, costs, starting dates for each phase, and completion dates." *Id.* ¶ 12. These components are known as "deliverables," and such deliverables are constrained by a budget, a schedule, and a completion deadline. *Id.*

As the GEITA contractor, Plaintiff oversaw the work EA did for the Air Force. SAC, ECF No. 68 ¶ 7; Pl. Depo. Tr. at 15, ECF No. 105-3, Exh. 4. More specifically, Plaintiff "provide[d] technical quality assurance oversight for the Installation Restoration Program (IRP)," "provide[d] formal reviews of key documents for the cleanup of environmentally sensitive sites throughout the installation," "manage[d] and track[ed] deliverables submitted by [EA] . . . and ensure[d] they [were] on schedule," and "provide[d] programming support, as required, as well as any other support necessary to accomplish cleanup goals, including co-authoring various IRP management

1 documents." Civille Decl., Exh. 4 at 2, ECF No. 114-13.

Although Plaintiff was employed by BAH, she worked out of the Civil Engineering Environmental Restoration Office on AAFB where she interacted primarily with Air Force employees Gregg Ikehara ("Ikehara"), Danny Agar ("Agar"), and Jess Torres ("Torres"). *See id.*; Agar Decl. ¶¶ 2, 14, 16, ECF No. 113-1.

### C. PLAINTIFF DISCOVERS EA BILLING DISCREPANCIES; BAH'S REACTION

In "late 2005," Agar asked Plaintiff to examine EA's billing reports for one of the IRP sites.[1] *See* Agar Decl. ¶ 33, ECF No. 113-1. Plaintiff discovered that EA was double billing for work, and shared this with Agar and Ikehara. *See id.*; Ikehara Depo. Tr. at 78-79, ECF No. 114-10. Based on Plaintiff's findings, Agar encouraged her to continue investigating "EA's performance problems, including any fraudulent billings and overbilling for work," and Plaintiff found more instances of improper billing by EA. *See* Agar Decl. ¶ 34, 35, ECF No. 113-1. Ikehara recalls discussing the billing issues with Rosacker as Plaintiff brought the issues to his attention. *See* Ikehara Depo. Tr. at 31–33, 78–79, ECF No. 114-5,-10 (discussing conversations Ikehara had with Rosacker about improper billing).

On October 12, 2005, Rosacker received an email from Joel Lazzeri ("Lazzeri"), the Vice President of Pacific Operations for EA. *See* Def.'s Memo. in Support of Mtn., Exh. 5, ECF No. 105-3. In the email, Lazzeri stated that an EA employee "just got a one hour tongue lashing [sic] from Sue Hill regarding how crappy a company EA is and how crappy our reports are." *Id.* Some time in October 2005, Rosacker counseled Plaintiff and told her to "[g]o easy on them [EA]." Pl. Depo. Tr. at 280, ECF No. 114-1.

Around October or November 2005, Plaintiff began looking for another job. *Id.* at 40. Rosacker "made it clear [to Plaintiff] that if [she] . . . continued . . . doing [her] job as the oversight person -- being a good manager, finding -- flaws with the EA [sic], that [she] would get fired." *Id.*

---

[1] Auditing EA's billing was not the primary responsibility of Plaintiff as it was typically conducted by Air Force Center for Engineering and the Environment ("AFCEE") staff. ECF No. 114-3 at 3.

Page 3 of 20

at 42; *see also* Rosacker Decl. ¶ 10, ECF No. 105-2 (Rosacker states, "In November of 2005, I raised my concerns in a telephone call with [Plaintiff]. I advised her that her conduct, as reported to me, was inconsistent with BAH's core values, particularly that of teamwork, and that I expected her to improve her relationship with EA.").

In January 2006, Plaintiff attended a meeting in San Francisco, which Rosacker and Ikehara also attended. Ikehara Depo. Tr. at 49, ECF No. 114-7. While a discussion of EA's improper billing did not occur during the meeting, Plaintiff discussed the EA billing issues with Rosacker in a side conversation. *Id.* at 49–50. Rosacker then told Ikehara that there was a billing issue that "needed to be resolved or looked at." *Id.* at 50.

In February or March 2006, Plaintiff gave Agar and Ikehara spreadsheets and documents "detailing what appeared to be fraudulent billing charges by EA." Agar Decl. ¶ 38, ECF No. 113-1. Ikehara believes that he sent copies of the spreadsheets to Rosacker. *See* Ikehara Depo. Tr. at 67–69, ECF Nos. 114-8, -9. Agar also recalled that "[i]t was normal procedure within [their] office for Mr. Ikehara to provide any reports or spreadsheets received from Sue Hill to Mr. Rosacker at BAH." *See* Agar Decl. ¶ 41, ECF No. 113-1.

In March 2006, Agar informed Rosacker via telephone that "EA's deliverables were in bad shape, and [they] discussed [Plaintiff's] work and that she was uncovering significant billing discrepancies." *Id.* ¶ 42. Rosacker "sounded angry" and cut off the conversation; Agar got the impression that Rosacker was unhappy that Plaintiff was investigating EA's billings. *Id.*

Prior to being placed on probation, Plaintiff notified Ikehara that someone at BAH "was trying to keep her from disclosing information regarding [EA's] billing[s]" and "in essence trying to keep her from investigating [EA's billings]." Ikehara Depo. Tr. at 59, ECF No. 114-8.

### D. BAH PLACES PLAINTIFF ON PROBATION

On March 31, 2006, BAH placed Plaintiff on probation. *See* Def.'s Memo. in Support of Mtn., Exh. 8, ECF No. 105-3. On April 7, 2006, Plaintiff acknowledged receipt of the Notice of Probation ("the Notice"). *See id.* According to the Notice, Plaintiff was placed on probation

because of "unprofessional and disrespectful behavior toward a contractor," "continued non-compliance with [her] role as an A&AS oversight contractor who should report contractor activity to the Air Force," and "[r]equest[s for] unnecessary multiple iterations of corrections of time-critical documents . . . even after the client has shown satisfaction with the contractor's responses." *Id.* The Notice further advised Plaintiff that BAH "must see immediate, substantial, and sustained progress or further disciplinary action [would] result in termination." *Id.*

On April 27, 2006, Miranda emailed Rosacker and indicated that Plaintiff was improving:

> [T]he feedback I got from [Ikehara], again is that things are improving. [Ikehara] noted a positive change in [Sue's] work and her dealings w/ EA. As I mentioned previously, Toraj has also noticed an improvement although the real test is yet to come. So other than her actions not related to the client, [Sue is] doing really well.

Rosacker Decl., Exh. 3, ECF No. 105-2.

### E.     **PLAINTIFF PRESENTS FINDINGS OF EA BILLING DISCREPANCIES**

On May 11, 2006, Plaintiff presented additional spreadsheets that summarized EA billing discrepancies to Ikehara. Ikehara Depo. Tr. at 80–81, ECF No. 114-11. On that same day, Ikehara called Rosacker and informed him of Plaintiff's allegations that EA was overbilling and double billing the government. *Id.* at 81. Rosacker indicated that he would look into the allegations. *Id.*

### F.     **BAH TERMINATES PLAINTIFF**

On May 12, 2006, BAH emailed Plaintiff and requested a teleconference. SAC ¶ 14, ECF No. 68. During the teleconference, "Plaintiff was informed . . . that she had made only small improvements and it was not enough to keep her employed by [BAH]." *Id.*

On May 15, 2006, Plaintiff received a formal letter of termination signed by Paul Doolittle ("Doolittle"), the Vice President of BAH. *See* Def.'s Memo. in Support of Mtn., Exh. 10, ECF No. 105-3 at 54. According to the letter, Plaintiff was being terminated because of "Unsatisfactory Performance." *Id.*

## II.     **RELEVANT PROCEDURAL BACKGROUND**

On June 21, 2007, Plaintiff initiated this action in the United States District Court for the Central District of California, by filing a complaint alleging wrongful retaliatory termination, in

1  violation of Section 1102.5 of the California Labor Code, and wrongful termination in violation of
2  public policy, based on the policies underlying Section 1102.5 of the California Labor Code as well
3  as the California Fair Employment and Housing Act. *See* Complaint, ECF No. 1.

4  On July 17, 2007, BAH moved to dismiss the complaint, and also moved to strike portions
5  of the complaint. *See* ECF Nos. 7–10. On August 23, 2007, the Central District granted BAH's
6  motion to dismiss as to the first claim (on account of failure to exhaust administrative remedies),
7  denied the motion as to the second claim, and denied the motion to strike as moot. Minute Order,
8  ECF No. 16.

9  On September 7, 2007, Plaintiff filed her First Amended Complaint. ECF No. 26. On
10 October 22, 2007, BAH moved to transfer this case to this court. ECF No. 28. The Central District
11 granted this motion, over Plaintiff's opposition, on November 20, 2007. *See* Minute Order, ECF No.
12 36.

13 On January 23, 2009, Plaintiff filed her SAC. ECF No. 68. Plaintiff alleges two claims in
14 the SAC: Workplace Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h); and
15 Wrongful Termination in Violation of Public Policy. *Id*. ¶¶ 15–29.

16 On February 17, 2009, BAH moved to dismiss the SAC, pursuant to Federal Rule of Civil
17 Procedure 12(b)(6). Def.'s Mtn. to Dismiss, ECF No. 69. The court denied the motion on June 9,
18 2009. Order Denying Mtn. to Dismiss, ECF No. 76.

19 On January 7, 2011, BAH filed the instant Motion for Summary Judgment. *See* ECF Nos.
20 104, 105. Upon stipulation of the parties, the court extended the briefing deadlines to allow the
21 parties to try and settle the matter. *See* ECF Nos. 108, 110. However, the parties could not reach
22 a settlement agreement.

23 On February 4, 2011, Plaintiff filed her opposition to the Motion. ECF No. 113. To support
24 her opposition, Plaintiff included a Declaration from Danny Agar. *See id.*

25 On February 25, 2011, BAH filed its reply. ECF No. 117. That same day, BAH also filed
26 a Motion to Strike Portions of the Declaration of Danny Agar ("the Motion to Strike"). ECF No.

119. On March 11, 2011, Plaintiff filed her opposition to the Motion to Strike. ECF No. 122. BAH filed its reply on March 18, 2011. ECF No. 123.

The court heard the Motion and the Motion to Strike on September 16, 2011. *See* Hrg. Minutes, ECF No. 127. At the hearing, the court denied the Motion to Strike, and took the Motion under advisement. *See id.*

### III. APPLICABLE STANDARDS

Federal Rule of Civil Procedure 56(a) provides that the court should grant summary judgment "if the movant shows that there is ***no genuine issue as to any material fact***." FED. R. CIV. P. 56(a) (emphasis added). The moving party has the initial burden of demonstrating that there is an absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). This burden is satisfied by merely "pointing out to the district court [ ]that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party satisfies this burden, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). More specifically, the nonmoving party must "cit[e] to particular parts of materials in the record" that demonstrate a genuine issue of material fact or "show[ ] that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(e).

When viewing the evidence proffered by the parties, the court should not make credibility determinations or weigh the evidence; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59 (1970)). Furthermore, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

Ultimately when presented with a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The court may not grant summary judgment "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## IV. ANALYSIS

BAH moves the court for summary judgment pursuant to Civil Rule of Procedure 56. *See* ECF Nos. 104, 105. BAH argues that court should grant summary judgment for the claim of Workplace Retaliation and the claim of Wrongful Termination in Violation of Public Policy as set forth in the SAC. As discussed below, the court finds that there are genuine issues of material facts as to both claims.

### A. FALSE CLAIMS ACT RETALIATION CLAIM

The False Claims Act ("FCA") was originally enacted during the Civil War to combat fraud among government contractors who were overcharging and shipping faulty goods to the government. *See United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 995 (9th Cir. 2010) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265–66 (9th Cir. 1996)). To promote the exposure of fraud, the FCA has a "*qui tam* provision that permits private persons (known as 'relators') to bring civil actions on behalf of the United States and claim a portion of any award" recovered through the suit. *Id.* (citing 31 U.S.C. § 3730(b), (d) (2008); *Hopper*, 91 F.3d at 1266 n.7).

To further encourage employees to expose fraud, the FCA was amended in 1986 to include an anti-retaliation provision to protect whistleblowers. *See Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 823 (9th Cir. 2005). In pertinent part, § 3730(h)[2] provides—

---

[2] The FCA retaliation provision was amended after the commencement of this instant action, but the amendments to § 3730(h) do not apply retroactively: "[e]xcept as otherwise provided under Public Law 111-21, § 4(f)(1), (2), amendments made by Public Law 111-21, § 4, shall take effect on May 20, 2009, and shall apply to conduct on or after May 20, 2009." *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1625. The amendments made to 3730(h) are set forth in § 4(d) of Public Law 111-21, thus the exception contained in § 4(f) is inapplicable here. *See id.*, 123 Stat. 1624–25.

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2006).

To establish a prima facie case of retaliation under the FCA, an employee has the burden of proving that: "1) the employee [was] engaging in conduct protected under the [FCA]; 2) the employer [knew] that the employee was engaging in such conduct; and 3) the employer . . . discriminated against the employee because of her protected conduct." *Hopper*, 91 F.3d at 1269. "At summary judgment, the degree of proof necessary to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'"[3] *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (quoting *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir.2002)).

The parties agree that the *McDonnell Douglas* burden-shifting framework applies to Plaintiff's FCA-retaliation claim. *See* Def.'s Memo. in Support of Mtn. at 17, ECF No. 105; Pl.'s Opp'n at 6, ECF No.113; *see also Scott v. Metro. Health Corp.*, 234 F. App'x 341 (6th Cir. 2007) (applying *McDonnell Douglas* to an FCA-retaliation claim). Under the *McDonnell Douglas* framework, once an employee establishes a prima facie case of retaliation, there is a presumption of discrimination, and "the burden [then] shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

---

[3] Although these cases involved a Title VII claim, the court finds that the standard also applies to Plaintiff's FCA claim. In disposing of FCA issues the Ninth Circuit has turned to Title VII cases for guidance. *See Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 847–48 (9th Cir. 2002) ("[B]ehavior does not constitute retaliation under the False Claims Act . . . unless it would be sufficient to constitute an adverse employment action under Title VII."). Furthermore, as in other discrimination cases, once a FCA-retaliation plaintiff establishes a prima facie case, the ultimate issue of whether the employer took adverse action against an employee for legitimate or pretextual reasons should be resolved by the jury. However, even applying the preponderance-of-the-evidence, there is enough evidence in the record from which a reasonable jury could find that Plaintiff has established a prima facie case of discrimination.

1 (1973), to an ADEA discrimination claim). If the employer carries out this burden, "the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination." *Id.*

In conducting its analysis, the court bears in mind that "[t]he plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question [of discrimination] is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, . . .'" *Chuang v. Univ. of Cal., Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

**1.** **PRIMA FACIE CASE**

**a.** **Plaintiff engaged in protected conduct**

First, BAH argues that Plaintiff did not engage in protected conduct. To engage in protected conduct, an employee does not need to have a "[s]pecific awareness of the FCA," rather the employee need only "be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Hopper*, 91 F.3d at 1269.[4] More specifically, an employee engages in protected conduct if: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore*, 275 F.3d at 845.

Whether Plaintiff engaged in protected conduct, turns on the specific facts of this case. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001) ("Determining what activities constitute 'protected conduct' is a fact specific inquiry.").

There is undisputed evidence that Plaintiff discovered improper billing by EA at the end of 2005. While Plaintiff could not immediately determine whether fraud was being committed against

---

[4] *See also United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 739–40 ("There is nothing in that language to suggest that the employee must already have discovered a completed case. . . . This manifests Congress' intent to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together.") (citing *Neal v. Honeywell, Inc.*, 33 F.3d 860, 864 (7th Cir. 1994)).

1  the government, with the encouragement of the Air Force client, she continued to investigate the
2  matter and found more billing improprieties. Then in February or March of 2006, Plaintiff began
3  compiling spreadsheets and documents of EA's alleged overbilling and double billing. Plaintiff
4  continued her investigations into the fraudulent billing and compiled comprehensive spreadsheets
5  that itemized the instances of overbilling and double billing by EA in May 2006. To illustrate the
6  extent of Plaintiff's investigation, in one instance, Plaintiff found that EA was overbilling the
7  government by as much as $600,000. *See* Agar Decl. ¶ 33, ECF No. 113-1.

In *Zahodnick v. International Business Machines Corp.*, the court held that "[s]imply reporting [a] concern of a mischarging to the government to [a] supervisor" is not protected conduct. 135 F.3d 911, 914 (4th Cir. 1997). In this case, Plaintiff did more than merely report a concern that EA was mischarging the government; rather, she carried out an extensive investigation of EA's billings for potential fraud. Construing the facts in favor of Plaintiff, a reasonable jury could find that she had a good faith belief, and a reasonable employee in similar circumstances might believe, that EA was possibly committing fraud against the government. *See Moore*, 275 F.3d at 845.

Although Plaintiff never brought a *qui tam* action against EA or BAH, "the case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful or even filed." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996) (citing *Clemes v. Del Norte Cnty. Unified Sch. Dist.*, 843 F. Supp. 583, 595–96 (N.D. Cal. 1994)). Thus, a reasonable jury could find that Plaintiff engaged in protected conduct.

BAH contends that Plaintiff did not engage in protected conduct because "the conduct at issue was within the scope of her job duties." *See* Def.'s Memo. in Support of Mtn. at 13, ECF No. 105. However, a reasonable jury could disagree with BAH's characterization of Plaintiff's investigation of EA's billings as being part of her normal job duties. While Plaintiff had "the authority to review EA's invoices," it was not part of her job to investigate and report fraudulent billing. Civille Decl., Exh. 4 at 2, ECF No. 114-13 (describing Plaintiff's job duties). Moreover, BAH appeared to be unhappy with the fact that Plaintiff was investigating EA's billings. *See* Agar

Decl. ¶ 41, ECF No. 113-1. Given the facts in the record, a reasonable jury could find that Plaintiff's investigation of EA's billings was outside the scope of her normal job duties.

Moreover, even if a reasonable jury found that Plaintiff's protected conduct was part of Plaintiff's work duties, the cases cited by BAH do not support its notion that there is some per se rule that excludes normal work duties from the scope of protected conduct.[5] Rather, the cases suggest that if an employee's work duties include the investigation of fraud, then the employee would have a heightened burden of demonstrating that the employer had notice. *See infra* n.5.

Having determined that a reasonable jury could find for Plaintiff on the issue of protected conduct, the court turns to the issue of notice.

### b.  **BAH had notice of protected activity**

BAH contends that even if Plaintiff's investigations amounted to protected conduct, BAH did not have notice that she was engaging in such activity prior to her termination. Def.'s Memo. in Support of Mtn. at 15, ECF No. 105. The plaintiff has the burden of demonstrating that the employer knew she was engaging in protected conduct. *See Moore*, 275 F.3d at 846–47. "[T]he kind of

---

[5] *See Yuhasz v. Brush Wellman Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (dismissing the plaintiff's claim because he failed to allege that his employer had the requisite notice that the plaintiff was engaged in protected activity, and not merely because the conduct fell within the scope of the plaintiff's work duties); *Ramseyer*, 90 F.3d at 1523 n.7 ("Our citation to these cases should not be read to suggest that an individual whose job entails the investigation of fraud is automatically precluded from bringing a section 3730(h) action."); *Hutchins*, 253 F.3d at 187 ("Under the appropriate set of facts, [protected conduct] can include internal reporting and investigation of an employer's false or fraudulent claims."); *Maturi v. McLaughlin Research Corp.*, 413 F.3d 166, 172 n.16 (1st Cir. 2005) ("[W]here an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' ... is heightened.") (quoting *Hutchins*, 253 F.3d at 191) (internal quotation marks omitted) (alterations in original); *United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 129 (W.D. Pa. 2006) (dismissing the retaliation claim after finding the plaintiff's "acts as alleged would constitute protected activity, but nowhere is it alleged that [the plaintiff] sought to conduct this activity to institute a FCA action and therefore, it was not protected activity.").

None of these cases adopted a per se rule that excludes an employee's normal work duties from the scope of protected conduct. Moreover, such a rule would be harmful to the purpose of the anti-retaliation provision in that employers would be free to retaliate against the very employees who are most likely to discover fraud against the government. *See Eberhardt v. Integrated Design and Constr., Inc.*, 167 F.3d 861, 869 n.2 (4th Cir. 1999). At best, the cases indicate that if the alleged protected conduct falls within the scope of the employee's normal work duties, the employee will have a heightened burdened of establishing that her employer was on notice that she engaged in protected conduct.

knowledge the [employer] must have mirrors the kind of activity in which the [employee] must be engaged. What [the employer] must know is that [the employee] engaged in protected activity."[6] *Hutchins*, 253 F.3d at 188 (quoting *Yesudian*, 153 F.3d at 742) (alterations in original) (internal quotation marks omitted).

In FCA retaliation cases, courts have found notice when "the plaintiff . . . produced evidence that he or she voiced a concern about fraud on the federal government or referenced a qui tam FCA action to the employer." *United States ex rel. Lockyer v. Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1084–85 (9th Cir. 2007) *aff'd*, 343 F. App'x 279 (9th Cir. 2009). On the other hand, "when an employee voices complaints but does not refer to any allegations of fraudulent conduct against the government, the employer lacks the requisite knowledge to make out a FCA retaliation claim." *Id.* at 1085. Like the protected conduct analysis, determining whether an employer had notice is a fact specific inquiry. *See Hutchins*, 253 F.3d at 189.

Here, Ikehara recalled discussing Plaintiff's billing investigation with Rosacker in late 2005.

---

[6] If a jury found that Plaintiff's protected conduct was part of her work duties, the notice requirement would differ. When an employee's job duties entail the investigation of fraud, the knowledge threshold is heightened, and "the employee must make it clear that the employee's actions go beyond the assigned task." *Eberhardt*, 167 F.3d at 868. More specifically, the employee must put "the employer on notice that a qui tam suit under section 3730 is a reasonable possibility. Such notice can be accomplished by expressly stating an intention to bring a qui tam suit, but it may also be accomplished by *any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility*." *Id.* (emphasis added).

In *Eberhardt*, the plaintiff investigated the defendant company's practice of billing the State Department for uncompleted work. 167 F.3d at 865. Through his investigations, the plaintiff discovered the defendant company billed the government for $1.3 million of uncompleted work. *Id.* The plaintiff proceeded to inform the president and CEO of the defendant company that "there was an appearance of criminality," and advised the CEO that he should obtain legal counsel. *Id.* Continuing his investigation, the plaintiff submitted a written report of the advanced billings to the Board of Directors of the defendant company, and it was ultimately forwarded to the federal government. *Id.* The court held that the plaintiff effectively put his employer on notice that FCA litigation was a reasonable possibility by characterizing the billings as illegal and advising the CEO to obtain legal counsel. *Id.* at 869.

However, an employee need not go as far as the *Eberhardt* plaintiff to satisfy the notice requirement; rather, as discussed above, an employee satisfies the notice requirement by demonstrating that the employer had notice that litigation was a reasonable possibility. *See id.* at 868. Here, even if Plaintiff needed to meet the heightened notice threshold, there are sufficient facts from which a reasonable jury could find that BAH knew that litigation was a reasonable possibility and that Plaintiff's conduct went beyond her assigned work task.

Then in January 2006, Plaintiff discussed the EA billing issues with Rosacker, and Rosacker told Ikehara that there were billing issues that needed to be resolved; again, this was before Plaintiff was placed on probation and terminated. Later, in February or March 2006, Ikehara recalls sending spreadsheets depicting Plaintiff's findings of EA's overbilling and double billing to BAH. This is corroborated by Agar's recollection that it was regular practice for Ikehara to send Plaintiff's documents to Rosacker. Providing even more direct evidence that BAH had notice, in March 2006, Agar discussed the overbilling and double billing that Plaintiff was discovering with Rosacker. All of this occurred before BAH placed Plaintiff on probation. Finally, on May 11, 2006, Plaintiff presented spreadsheets of EA's double billing and overbilling to Ikehara. That same day, Ikehara informed Rosacker of Plaintiff's allegations that EA was overbilling and double billing the Air Force. This occurred one day before Plaintiff was notified that BAH was going to terminate her employment. Construing the facts in favor of Plaintiff, a reasonable jury could find that BAH was on notice that Plaintiff was engaging in protected conduct.

BAH relies on the fact that Plaintiff has conceded that she did not directly notify them that she was investigating potential fraud by EA. *See* Def.'s Memo. in Support of Mtn. at 15, ECF No. 105. However, nothing in the FCA or the relevant case law requires an employee to directly notify an employer of an investigation. Rather, to satisfy the notice requirement, Plaintiff need only show that BAH knew that she engaged in protected conduct, not that she herself notified them. *See Hopper*, 91 F.3d at 1269 (the employee must "show the *employer had knowledge the employee engaged in protected activity*.") (quoting S. REP. NO. 99-345, at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300) (internal quotation marks omitted) (emphasis added). This is logical given that the rationale behind the notice requirement is that an employer could not have possessed the requisite retaliatory motive if it was unaware that the employee was engaging in protected conduct. *Id.* Thus actual notice, whether direct or indirect, would satisfy the rationale behind the notice requirement. *See id.*

Having found that a reasonable jury could find that BAH was on notice that Plaintiff was

Page 14 of 20

Case 1:07-cv-00034 Document 132 Filed 11/16/11 Page 14 of 20

engaging in protected conduct, the court must determine whether there is a nexus between Plaintiff's protected conduct and BAH's decision to fire her.

### c. BAH discriminated against Plaintiff because of protected activity

BAH contends that even if they were on notice that Plaintiff engaged in protected conduct, BAH terminated Plaintiff for legitimate, non-discriminatory reasons. Under the FCA, "the employee must show that 'the retaliation was motivated at least in part by the employee's engaging in protected activity.'" *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 518 (6th Cir. 2000) (quoting S. REP. NO. 99-345, at 35, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300); *see also Hopper*, 91 F.3d at 1269 (stating that the employee has the burden of showing that the employer discriminated against her because of her protected conduct). To satisfy this prong, Plaintiff must show that BAH discriminated against her because of her protected conduct.

Plaintiff argues that the timing between her investigations into EA's improper billing and BAH's adverse employment actions is sufficient to satisfy the causation element of her FCA claim. *See* Pl.'s Opp'n at 12–13, ECF No. 113. In the Ninth Circuit, "[t]emporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003) (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)). However, "timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination [or other adverse action] must have occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065 (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000)) (internal quotation marks omitted).

In this case, the Plaintiff's protected conduct is almost perfectly mirrored by her placement on probation and her eventual termination. As discussed above, sometime around February or March 2006, Ikehara gave Rosacker spreadsheets that Plaintiff compiled to identify instances of EA's improper billings. Then, on March 31, 2006, Plaintiff was placed on probation. The timing here is between one or two months, and sufficient to establish causation. *See id.* (citing case where three-

month gap between protected conduct and adverse action was proximate enough to establish causation). Further supporting a nexus between Plaintiff's protected conduct and her probation, Agar recalled that Rosacker sounded angry about the fact that Plaintiff was investigating EA's improper billings.

Despite being placed on probation, Plaintiff continued to investigate EA's billing. On May 11, 2006, Plaintiff presented comprehensive spreadsheets that identified instances of EA's overbilling and double billing to Ikehara, and Ikehara in turn informed Rosacker of Plaintiff's allegations. Rosacker told Ikehara that he would look into the allegations. However, on May 12, 2006, instead of investigating EA's billings, BAH informed Plaintiff that she did not improve enough to continue her employment with BAH. Plaintiff then received her formal letter of termination on May 15, 2006, merely four days after BAH indicated that they would investigate Plaintiff's allegations of EA's overbilling and double billing. The timing between BAH's knowledge of the spreadsheets and Plaintiff's termination is also sufficient to establish causation. Thus, Plaintiff has established a nexus between her protected conduct and her placement on probation and eventual termination, and therefore, she has established a prima facie case of FCA retaliation under *Hopper*.

BAH argues that Doolittle made the decision to fire Plaintiff and had no knowledge of Plaintiff's billing investigations. While Plaintiff does not present any evidence that Doolittle was on notice, there is ample evidence to support a "cat's paw" theory of liability, under which an employer may still be liable for discrimination even if the ultimate decision maker did not act with discriminatory intent. *See Staub v. Proctor Hosp.*, __ U.S. __, __, 131 S. Ct. 1186, 1194 (2011). Under the "cat's paw theory," Plaintiff must prove that one of Doolittle's subordinates set in motion Doolittle's decision to terminate Plaintiff because of her protected activity, and that the subordinate was involved in or influenced Doolittle's decision to terminate Plaintiff. *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1060–61 (9th Cir. 2011).

Here, a reasonable jury could find that Rosacker, Doolittle's subordinate, set in motion the decision to terminate Plaintiff because of her protected conduct. This is a reasonable inference based

on the evidence that Rosacker had a close relationship with EA and was unhappy about Plaintiff's investigations of EA's billings. Doolittle, in turn, relied exclusively on Rosacker's reports about Plaintiff's job performance in making the decision to terminate Plaintiff. *See* Doolittle's Decl. ¶¶ 5, 6, 8, 9, ECF No. 105-3. Thus, a reasonable jury could find BAH liable for discrimination under a "cat's paw" theory of liability.

### 2. BAH ARTICULATES NON-DISCRIMINATORY REASON FOR FIRING PLAINTIFF

BAH contends that "Plaintiff's poor performance and inability to comport herself in a manner consistent with the firm's core values of teamwork and professionalism led to the termination of her employment." Def.'s Memo. in Support of Mtn. at 17, ECF No. 105. BAH maintains that Plaintiff's work deficiencies began well before she began investigating improper billing by EA and cites to specific instances of such deficiencies. *See id.* at 17–18. Thus, BAH has satisfied its burden of articulating a legitimate, non-discriminatory reason for terminating Plaintiff, and the burden shifts back to Plaintiff.

### 3. PRETEXT

Plaintiff must demonstrate that BAH's "articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Villiarimo*, 281 F.3d at 1062. "All of the evidence [as to pretext]—whether direct or indirect—is to be considered cumulatively." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003)). Furthermore, if the evidence is indirect, "the plaintiff must present 'specific' and 'substantial' facts showing that there is a genuine issue for trial." *Id.* However, this requirement is moderated by the "observation that, in the context of [workplace-discrimination ]claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is "hardly an onerous one.""[7] *Id.* (quoting *Payne v. Norwest Corp.*, 113 F.3d

---

[7] While this rule was applied to a Title VII case, the court finds that it is also applicable to the instant FCA-retaliation claim. *See supra* n.3.

1079, 1080 (9th Cir. 1997)).

Plaintiff argues that BAH's proffered reason for firing her was pretextual. Plaintiff asserts that she was really fired because she investigated potentially fraudulent billing by EA, and BAH fired her to protect EA. *See* Pl.'s Opp'n at 16, ECF No. 113. There is evidence in the record that Rosacker had a close relationship with EA, that he wanted Plaintiff to go easy on EA, and that he was unhappy about Plaintiff's investigations into EA's billings. Thus, a reasonable jury could find that BAH fired Plaintiff because she "rocked the boat" by engaging in protected conduct and that their proffered justification for firing her was mere pretext.

Plaintiff also argues that BAH's proffered reasons are not worthy of credence and adequately refutes the specific instances that BAH cites to support their legitimate reason for firing her. First, BAH cites to Plaintiff's work-performance review from April 2005 for the proposition that Plaintiff "only partially met certain performance criteria." *See* Def.'s Memo. in Support of Mtn. at 17, ECF No. 105. While true that Plaintiff only partially met some of the criteria, as Plaintiff points out, that very same review stated that she was "fully consistent with the Firms [sic] Core Values." *See* Pl.'s Opp'n at 15, ECF No. 113; *see also* Def.'s Memo. in Support of Mtn., Exh. 2 (Pl.'s Apr. 2005 review), ECF No. 105-2 at 1. This sheds doubt on BAH's assertion that Plaintiff did not adhere to the firm's core values.

Moreover, BAH's basis for finding that Plaintiff did not fulfill the company's core value of teamwork was based on a finding that she was not getting along with EA. However, Plaintiff's job was not to get along with EA, it was to oversee EA—a relationship that naturally lends itself to conflict and disagreement. Plaintiff argues that BAH lost sight of the fact that the Air Force was their client, not EA.

Second, BAH cites to an email to Rosacker from EA's Vice President, Joel Lazzeri ("Lazzeri"), in which Lazzeri complains about a "one hour tongue lashing [sic] from Sue Hill." *See* Def.'s Memo. in Support of Mtn. at 17, ECF No. 105. The email does indicate that Plaintiff may have been hard on EA, but that is to expected in a relationship between one who is assigned to

oversee and one who is being overseen. Thus, construing all reasonable inferences in favor of Plaintiff, a reasonable jury could find that Plaintiff was simply doing her job and EA did not like that fact.

Third, BAH cites Plaintiff's unprofessional and openly confrontational behavior with EA. *Id.* at 18. Plaintiff refutes this reason with Agar's statements that Plaintiff was not confrontational and that EA's manager, Toraj Ghofrani, was difficult to work with. Pl.'s Opp'n at 19, ECF No. 113. As Plaintiff points out, conflict was bound to arise when Plaintiff began asking questions about EA's overbilling and double billing.

Lastly, BAH cites to Plaintiff's placement on probation and her failure to improve her behavior thereafter. *See* Def.'s Memo. in Support of Mtn. at 18, ECF No. 105. As discussed above, a reasonable jury could find that Plaintiff was placed on probation because of her protected conduct; thus her probation term alone is not persuasive. Moreover, on April 27, 2006, Miranda sent Rosacker an email and stated that "that things [were] improving. [Ikehara] noted a positive change in [Sue's] work and her dealings w/ EA. As I mentioned previously, Toraj has also noticed an improvement . . . ." Rosacker Decl., Exh. 3, ECF No. 105-2. This email was sent approximately two-and-a-half weeks before Plaintiff was terminated.

The court is persuaded by Plaintiff's arguments that discriminatory reasons more likely motivated BAH and that BAH's proffered reasons are unworthy of credence. Accordingly, Plaintiff has satisfied her burden of demonstrating pretext. "[I]f the plaintiff can show pretext, then the McDonnell Douglas framework "disappear[s]," and "the sole remaining issue [i]s 'discrimination vel non.'" *Villiarimo*, 281 F.3d at 1062 (quoting *Reeves*, 530 U.S. at 142–43). Thus, it is up to the ultimate factfinder to determine whether BAH discriminated against Plaintiff because of her protected conduct, and summary judgment on this claim is not appropriate.

**B.** **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY CLAIM**

Under California law, "an employer's right to discharge an at-will employee is subject to limits that fundamental public policy imposes." *Green v. Ralee Eng'g Co.*, 960 P.2d 1046, 1048 (Cal.

1998) (*citing Tameny v. Atl. Richfield Co.*, 610 P.2d 1330, 1332-33 (Cal. 1980)). "[A]t-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy." *Id*. In virtue of their provenance, such tort claims are also known as "*Tameny* claims."

To support a *Tameny* claim, the public policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of discharge; and (4) substantial and fundamental." *City of Moorpark v. Superior Court (Hadden)*, 959 P.2d 752, 762 (Cal. 1998) (internal quotation omitted). In this case, the FCA is a delineated statutory provision, it is public, it was well established at the time of Plaintiff's discharge, and it is substantial and fundamental.

To prove a claim for wrongful discharge, Plaintiff must prove that (1) she was employed by BAH, (2) BAH discharged her, (3) the alleged violation of public policy was a motivating reason for discharge, and (4) the discharge caused her harm. *See Haney v. Aramark Unif. Servs., Inc.*, 17 Cal. Rptr. 3d 336, 641 (Cal. Ct. App. 2004). It is undisputed that Plaintiff was employed by BAH, and that BAH discharged her. Furthermore, as discussed above, there is a genuine dispute as to whether Plaintiff's protected conduct was a motivating reason for her discharge. A reasonable jury could very well find that Plaintiff was terminated in violation of public policy. Thus, summary judgment on this claim is not appropriate.

## V. CONCLUSION

Based on the foregoing discussion, the court hereby **DENIES** the Motion for Summary Judgment as to both the FCA-retaliation claim and the wrongful-termination claim. Plaintiff has presented sufficient evidence to demonstrate a genuine dispute of material fact for both claims in that a reasonable jury could find that BAH discriminated against her because of her protected activity.



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Nov 16, 2011**